**SO ORDERED.**

**SIGNED this 03 day of June, 2008.**



_____
**A. Thomas Small**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| RADOJE ALLYN VUJOVIC | 05-05125-5-ATS |
|     DEBTOR | |
| | |
| RADOJE ALLYN VUJOVIC | ADVERSARY PROCEEDING NO. |
|     Plaintiff | S-07-00036-5-AP |
|     v. | |
| DIRECT LOANS and THE EDUCATION RESOURCES INSTITUTE, INC. | |
|     Defendants. | |

### MEMORANDUM OPINION AND ORDER

The trial of this adversary proceeding to determine, pursuant to 11 U.S.C. § 523(a)(8), the dischargeability of student loans aggregating more than $280,000 owed by the chapter 7 debtor, Radoje Allyn Vujovic, to the Department of Education of the United States and to The Education Resources Institute ("TERI"), was held in Raleigh, North Carolina on May 8, 2008. The court agrees with the Department of Education and TERI that the debtor has not established that his student loans are dischargeable, but the court, pursuant to its authority under 11 U.S.C. § 105(a), will

defer the ultimate resolution of this issue and will, for a limited period of time, enjoin collection of the debtor's student loan obligations.

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(I), which this court may hear and determine.

The debtor is a 41-year old consumer bankruptcy attorney who maintains that he cannot make enough money in his law practice in Western North Carolina to satisfy the substantial student loans he incurred to attend law school, to obtain a master of laws degree, and to study for the bar exam. According to Mr. Vujovic, not discharging these debts would impose an "undue hardship," and his student loans should therefore be discharged.

Section 523(a)(8) provides that the following debts may not be discharged:

> for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8).[1] There is no dispute that the student loans made by the defendants in this adversary proceeding are the type of loans that would not be discharged if the debtor cannot establish an "undue hardship."

---

[1] Mr. Vujovic's petition was filed prior to October 17, 2005, the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, and the amendments to the Bankruptcy Code made by BAPCPA do not apply to this adversary proceeding. The result would not be different under either version of § 523(a)(8).

Section 523(a)(8) of the Bankruptcy Code makes it extremely difficult for debtors to discharge student loans. "Debtors receive valuable benefits from congressionally authorized loans, but Congress in turn requires loan recipients to repay them in all but the most dire circumstances." Educational Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 399 (4th Cir. 2005) (citing Pa. Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1995)). Debtors must show "exceptional circumstances," and must prove that "they are in the *limited class* of debtors for which § 523(a)(8) is meant to allow discharge." Educational Credit Mgmt. Corp. v. Mosko (In re Mosko), 515 F.3d 319, 324 (4th Cir. 2008) (citing Frushour, 433 F.3d at 404) (emphasis added in Mosko). "Congress sought to ensure repayment of educational loans through its use of the term 'undue' and the courts are obligated to follow its imperative." Frushour, 433 F.3d at 396. A "garden-variety hardship" is an "insufficient excuse for a discharge of student loans." Frushour, 433 F.3d at 399 (quoting Rifino v. United States (In re Rifino), 245 F.3d 1083, 1087 (9th Cir. 2001)).

The term "undue hardship," as used in § 523(a)(8), is not defined, but most courts have looked for guidance to the three-part test developed by the United States Court of Appeals for the Second Circuit more than twenty years ago in Brunner v. New York State Higher Education Services, 831 F.2d 395 (2d Cir. 1987). The Court of Appeals for the Fourth Circuit applies the Brunner test. See Ekenasi v. Education Res. Inst. (In re Ekenasi), 325 F.3d 541 (4th Cir. 2003) (adopting the Brunner test in chapter 13 cases); Frushour, 433 F.3d 393 (adopting the Brunner test in chapter 7 cases). The Brunner test requires debtors to establish, by a preponderance of the evidence, the following factors:

> (1) they cannot maintain, based on current income and expenses, a minimal standard of living for themselves and their dependent[s] if forced to repay the loans; (2)

3

>additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of their student loans; and (3) they have made good-faith efforts to repay their student loans.

Mosko, 515 F.3d at 323. A debtor must meet all three of the Brunner standards for the debtor's student loans to be dischargeable.

Mr. Vujovic satisfies the first Brunner prong because he would be unable, on his annual income of $22,000, to maintain a minimal standard of living if forced to repay his substantial student loans. Additionally, the debtor satisfies the third Brunner prong because he consistently attempted to make payments to both lenders, and made efforts to maximize his income as an attorney by working diligently to build his law practice and by living modestly and controlling expenses. The debtor's problem comes with the second Brunner prong, and he has not been able to show by a preponderance of the evidence that his unfortunate financial state of affairs is likely to persist for a significant portion of the repayment period. His circumstances may improve, but then again they may not. The debtor's financial prospects are subject to speculation and conjecture, and for that reason the court, although for now denying the debtor's request to discharge his student loans, will, as more fully explained below, defer its final decision for two years.

Facts

Radoje Allyn Vujovic, a consumer bankruptcy attorney who lives in Collettsville, North Carolina and who has law offices in Boone and Hickory, filed a petition for relief under chapter 7 of the Bankruptcy Code on October 13, 2005. A discharge was entered on January 18, 2006. Aside from three exempt Individual Retirement Accounts with an aggregate value of less than $17,000 as of the date of his bankruptcy, Mr. Vujovic has limited assets. His two leased law offices are equipped with basic equipment, office furniture and computers, which have a combined value of

4

approximately $2,500. The debtor's automobile is a 1995 Honda Del Sol with 230,000 miles and a value of less than $800. Mr. Vujovic owns no real property, and rents a room from his mother in her mobile home.

The debtor has no priority or secured debts, but has unsecured credit card debts of over $70,500. His other unsecured debts are the student loans to the defendants, the United States Department of Education and TERI. The balance of the Department of Education student loan, which originated as several loans made by the government through the William D. Ford Direct Loan Program in January 2001 in the aggregate amount of $142,491.95, is $223,358.60, including interest. The balance of the TERI student loan, which originated in December 2001 as a loan from Key Bank USA, N.A. in the amount $53,457.42 to consolidate three law school loans and a bar exam loan, is $56,928.94, including interest. The Key Bank loan was guaranteed by TERI, which paid the loan and became the owner of the loan in April 2007.

The debtor chose to pay the Department of Education loans through the Income Contingent Repayment Plan ("ICRP"), which allows borrowers to repay student loans based on their ability to pay. To facilitate those payments, the Department of Education was authorized by Mr. Vujovic to deduct the payment directly from his checking account. The debtor's income was low and frequently payments were not required, but payments totaling $1,084.29 were made through the ICRP program. The debtor also made payments on the TERI student loan and that loan was not in default at the time of the initiation of his bankruptcy case.

The debtor's schedules reflect that when he filed his petition in 2005, his gross monthly income as an associate in a law firm in Boone, North Carolina and as a part-time radio announcer was $2,800; his net monthly income was $1,892; his monthly expenses were $2,500, and his

5

disposable income was negative ($608). The debtor now has his own law practice, but his financial condition has not improved. According to the debtor's individual federal tax return for 2007, he received only approximately $23,000 from his law practice and part-time radio announcing.

Mr. Vujovic's lack of income is not from lack of trying. He graduated from law school in 1996 from DePaul University, is a member of the bars of the states of North Carolina, Illinois and Iowa, and, in addition to his law degree, received a master of laws degree in health law from DePaul in 2001. After law school he had trouble finding employment, worked briefly for a bankruptcy lawyer in Chicago, and was then underemployed as a paralegal. He moved to North Carolina in 2001 to reduce his living expenses, but again had trouble finding employment. In 2002 he earned just $500 from legal contract work and was paid $4,000 as a substitute radio announcer. His prospects improved in 2003 when he was hired as an associate to an attorney in Boone.

The following year Mr. Vujovic bought the law practice for $16,500 and also opened an office in Hickory. Mr. Vujovic's law firm reported gross revenue of $15,732 in 2004; $35,000 in 2005; $214,271 in 2006, and $232,407 for 2007. The debtor receives about $22,000 annually from the law firm and makes less than the $30,000 he pays to each of his two paralegals. The debtor works hard at his law practice, commuting from his home in Collettsville to his offices in Boone and Hickory (the driving distance between Collettsville and Boone is about 35 miles and the distance between Collettsville and Hickory is about 29 miles) and frequently works in the evenings at home. He has not recently sought other employment because he believes that his law practice will improve.

The debtor's law practice reimburses him for his automobile business mileage and for his health insurance premiums, but his other personal expenses are paid by his individual income. His

expenses are consistent with his low income. Mr. Vujovic rents a room from his mother in her mobile home for $250 per month, and his other monthly expenses include $203 as his share of the utilities, $350 for food, $50 for clothing, $40 for laundry and dry cleaning, $30 for grooming, $280 for medical expenses, and $75 for tobacco products. The debtor does not go to restaurants, clubs or to the movies, and frequently does legal work at home. His only recreation appears to be smoking.

Other relevant facts about Mr. Vujovic are that he is divorced and has no dependents. He is in relatively good health, and what medical problems he has are under control with medication. The debtor has not appeared before this court as an attorney, but when he appeared as a witness he made a favorable impression. As would be expected of a law graduate of DePaul who holds a master of laws degree and is the member of three state bars, Mr. Vujovic is well spoken and has a professional appearance and demeanor.

Brunner Test

As already stated, all three of the Brunner prongs must be met for the student loan to be discharged. Prongs one and three are met by the debtor in this case, and the court will address those first.

First Brunner Prong

The first question under the Brunner test is whether the debtor, based on current circumstances, can maintain a minimal standard of living if forced to pay the debtor's student loans. Mr. Vujovic's income is $22,000 per year and, although he has no dependents and lives with his mother, his income is not sufficient to support a reasonable lifestyle and to also pay $280,000 in student loans. The debtor offered evidence to show that to amortize his student loans over 25 years at 6% per annum interest would require monthly payments of more than $1,730. A monthly

7

payment of that amount in addition to his already modest expenses is not realistic, based on his current income.

Third Brunner Prong

The third Brunner prong requires a debtor to have made good faith efforts to repay the debtor's student loans. One aspect of that inquiry is a review of the debtor's payment history and the debtor's use of loan consolidation options. Frushour, 433 F.3d at 402. Here the debtor did pursue his loan consolidation options in connection with the Department of Education's student loans, and participated in ICRP up to the time of his bankruptcy. Mr. Vujovic also made payments on his TERI student loans, and that loan was current when his petition was filed. In short, Mr. Vujovic has done what he should have done to repay his loans when his financial situation made repayment very difficult.

Several circuit courts of appeal, including the Court of Appeals for the Fourth Circuit, also include in the third Brunner prong an examination of the debtor's "'efforts to obtain employment, maximize income, and minimize expenses.'" Frushour, 433 F.3d at 402 (quoting O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn), 339 F.3d 559, 564 (7th Cir. 2003)). This component of the third Brunner prong frequently overlaps with the analysis of the second prong, under which the court must determine whether the debtor's state of affairs is likely to persist. See, e.g., In re Gerhardt, 348 F.3d 89, 93 n.3 (5th Cir. 2003).

Mr. Vujovich has tried to maximize his income, and it is difficult to imagine how he could further reduce his expenses. He did not choose to have a low income. The debtor has worked hard, albeit unsuccessfully, to improve his law firm's bottom line. He continues to try. His pursuit of a career as an attorney, a profession for which he is well trained and which is generally considered to

pay well, was not foolhardy. Mr. Vujovic's financial circumstances are unfortunate, but he did not choose for them to be this way.

Second Brunner Prong

The second Brunner prong is often the most difficult of the three prongs to prove, and that is the case here. It requires debtors to show that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of their student loans." Mosko, 515 F.3d at 323. Courts have described this factor as requiring "'a total incapacity . . . in the future to pay [the debtor's] debts for reasons not within [the debtor's] control.'" Gerhardt, 348 F.3d at 92 (quoting Faish, 72 F.3d at 307). The Court of Appeals for the Fourth Circuit has observed that the second Brunner prong presents "'a demanding requirement,'. . . and necessitates that a 'certainty of hopelessness' exists that the debtor will not be able to repay the student loans." Frushour, 433 F.3d at 401 (quoting Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful, 267 F.3d 324, 328 (3rd Cir. 2001)). According to the Frushour court, "[o]nly a debtor with rare circumstances will satisfy this factor." Frushour, 433 F.3d at 401.

Several courts have held that a debtor's low income does not constitute an undue hardship if the debtor chose the job over other, higher-paying options. As the Frushour court explained, "[h]aving a low-paying job . . . does not in itself provide undue hardship, especially where the debtor is satisfied with the job, has not actively sought higher-paying employment, and has earned a larger income in previous jobs." Frushour, 433 F.3d at 401. In other words, when a debtor asks to discharge student loans, courts will look to see whether the debtor has other higher-paying employment alternatives, including alternatives outside the debtor's area of interest and expertise. Frushour, 433 F.3d at 401.

There are many cases in which courts have assessed debtors' alternatives. In Frushour, for example, a debtor made $10,000 per year as an artist, and in Gerhardt, a debtor made $20,000 annually as principal cellist for the Louisiana Philharmonic Orchestra: Neither could satisfy the second Brunner prong. Frushour, 433 F.3d at 397; Gerhardt, 348 F.3d at 92; see also Oyler v. Educational Credit Mgmt. Corp. (In re Oyler), 397 F.3d 382, 384 (6th Cir. 2005) (debtor making $10,000 as pastor of a church could not establish undue hardship).

The court observes that according to a recent analysis in Forbes.com of data recorded by the federal Bureau of Labor Statistics, the law profession is the 17th highest paying occupation in the country, and offers an average salary of $118,280. Paul Maidment, America's Best- And Worst-Paying Jobs, FORBES.COM (May 15, 2008). It is not unreasonable for Mr. Vujovic to pursue a career as an attorney. He has two law degrees from a good law school, is a member of three state bar associations, has a strong work ethic, presents a professional appearance, and has no obvious obstacles to achieving a successful practice.

Of course not all attorneys have successful practices, and this court over the years has seen attorneys of all specialties, including bankruptcy specialists, file for bankruptcy relief. Mr. Vujovic has been away from law school for more than 12 years and has yet to come close to making the average income reported by lawyers. But, Mr. Vujovic is optimistic that his practice will improve, and he has a number of factors working in his favor. A downturn in the economy will generally mean more work for consumer bankruptcy attorneys. Also, as the public and the bar become more familiar with and less afraid of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, consumers will seek bankruptcy protection in greater numbers. And, Mr. Vujovic's law practice is relatively new: If revenues increase, income should improve. There are many things a

good consultant might recommend to the debtor to improve his business model, and the debtor should seek expert advice.

The problem with the Brunner analysis, is that the court cannot say with any degree of certainty whether or not Mr. Vujovic's circumstances will improve. The Court of Appeals for the Fourth Circuit recognized this predicament in another student loan case involving an attorney, Ekenasi v. Education Resources Institute (In re Ekenasi), 325 F.3d 541 (4th Cir. 2003). The Ekenasi court held that the lower court's finding of "undue hardship" was based on excessively speculative findings with respect to the chapter 13 debtor's projected income and expenses. In reversing the lower court's discharge of the student loans, the appellate court observed that determining "undue hardship" at the beginning of a chapter 13 case was premature. Mr. Vujovic is a debtor under chapter 7, but the same observation applies in this case. The court cannot say with any certainty that the debtor's income will not improve, nor can it say that it will. His law practice is relatively new. He may make it, but then again he may not.

According to Frushour, for a student loan to be discharged, a debtor must demonstrate "certainty of hopelessness."  When a debtor truly is without hope, the debtor may prevail and the burden of the student loan may be lifted. But if a debtor in equally dire circumstances is instead *hopeful*, notwithstanding the hard times and the likelihood of continued hard times, must the cost of hope be permanent denial of discharge of the debt?  The answer to that question cannot be an unequivocal "yes."  Hope is not enough to end the inquiry and, ironically, permanently tip the scales against a struggling debtor. The answer must be derived from the facts, which in this case present in shades of gray. What is needed here, is time. Although Mr. Vujovic cannot at this moment demonstrate a "certainty of hopelessness," it is not fair to the debtor to make a premature assessment

of his prospects and to permanently deny him the relief he seeks. A better solution is to deny his request on an interim basis, and to re-evaluate his situation two years from now.

Mr. Vujovic may be able to repay his student loans in the future, but at this time his income is insufficient to make payments that would amortize these loans. However, over the next two years the debtor must continue his good faith efforts to repay his student loans consistent with his financial circumstances. The Department of Education and TERI can expect no more than that, and they will be restrained for the next two years from collecting their claims against the debtor in amounts that are beyond the debtor's ability to repay.

A hearing will be held in Raleigh, North Carolina at 11:00 on July 9, 2008, during which the court will determine the terms of repayment and the terms and conditions of an injunction that will apply to the Department of Education and TERI for the next two years. Until the terms of repayment and the two-year injunction are established, the Department of Education and TERI will be enjoined from all collection efforts with respect to the debtor's student loans.

In the past, the debtor was a participant in the ICRP program, and presumably he can participate in that program again. There may not be a similar program with respect to the TERI loan, but TERI may agree to repayment on conditions similar to ICRP. During the next 30 days the debtor and the Department of Education and TERI are encouraged to discuss repayment options.

This is a somewhat novel approach in a chapter 7 case, but one that is authorized by 11 U.S.C. § 105(a). Section 105(a) provides that the court

> may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

The United States Supreme Court recently recognized the broad authority of bankruptcy courts, under § 105(a), to prevent an abuse of process. In Marrama v. Citizens Bank of Massachusetts, the Court held that the "broad authority granted to bankruptcy judges to take any action that is necessary or appropriate to prevent an abuse of process described in § 105(a) of the Code, is surely adequate" to authorize denial of the motion to convert at issue in that case, rather than the conversion order that would have been entered in a more typical case. Marrama, 127 S. Ct. 1105, 1111 (2007). In examining the statutes at issue, the Marrama Court emphasized that "nothing in the text of either § 706 or § 1307(c) (or the legislative history of either provision) limits the authority of the court to take appropriate action" in response to the fraudulent actions of the debtor in that case, which the Court characterized as "atypical." Marrama, 127 S. Ct. at 1112; see also Tidewater Fin. Co. v. Williams, 498 F.3d 249, 258 (4th Cir. 2007) (explaining that in § 105(a), Congress gave bankruptcy courts power to preclude debtors from taking advantage of statutory "loopholes" as necessary to prevent an abuse of process); In re Bogdan, 414 F.3d 507, 513 (4th Cir. 2005) ("The Bankruptcy Code gives bankruptcy courts broad discretion to monitor all aspects of bankruptcy cases and to prevent abuses of process.").

But, the authority of § 105(a) is not limited to preventing abuses. The court may use that section when necessary or appropriate to carry out other provisions of the Bankruptcy Code, especially where, in this case as in Marrama, the Bankruptcy Code does not restrict its use. The Court of Appeals for the Fourth Circuit recently held that the broad powers conferred under § 105(a) authorize recharacterization of debt to equity. In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc., 453 F.3d 225, 231 (4th Cir. 2006) (holding that recharacterization is "well within the broad powers afforded a bankruptcy court in § 105(a) and facilitates the

application of the priority scheme laid out in § 726"). Nor is recognition of these powers a recent development – more than two decades ago, the court held that a bankruptcy court could enjoin parties from proceeding in state court against nondebtors where failure to enjoin would interfere with the rehabilitative process, thereby recognizing the need to protect the integrity of the bankruptcy estate. A.H. Robins Co., Inc., v. Piccinin, 788 F.2d 994 (4th Cir. 1986).

The Piccinin court explained that the statutory power of the bankruptcy court to stay actions involving the debtor is not limited to the automatic stay, and observed that it has been "repeatedly held" that § 105(a) "'empowers the bankruptcy court to enjoin parties other than the bankrupt' from commencing or continuing litigation." Piccinin, 788 F.2d at 1002. The court's injunctive authority and its prerogative to defer its final decision are being exercised in this core proceeding to more fairly adjudicate the dischargeabilty of the debtor's student loans. Deferring the final decision in this adversary proceeding and enjoining the defendants from collecting their student loans in amounts beyond the debtor's ability to pay is necessary to protect the integrity of the debtor's discharge and to achieve a just resolution of the issues before the court. The "equitable origins of the bankruptcy power suggest substantial leeway to tailor solutions to meet the diverse problems facing bankruptcy courts. Section 105 gives the bankruptcy court the power to fill in gaps and further the statutory mandates of Congress in an efficient manner." 2 Collier on Bankruptcy ¶ 105.01 p. 105-8.1 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008).

Accordingly, the debtor's request to discharge his student loan obligations to the Department of Education and to TERI is **PRELIMINARILY DENIED**, subject to a final determination that will be made after a final hearing to be held approximately two years from this date. The Department of Education and TERI are **ENJOINED** from collecting their student loans from the debtor until the

court, after the hearing on July 9, 2008, has determined the repayment terms of the student loan and the conditions of an injunction that will be applicable for the next two years.

**SO ORDERED**.

**END OF DOCUMENT**